# STATE OF NORTH CAROLINA

_____WAKE_____ County

*File No.*

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Angela Carter, as Admin. of the Estate of Ronald Stacey Rhodes<br><br>*Address*<br>c/o DeMent Askew Johnson & Marshall, P.O. Box 711<br><br>*City, State, Zip*<br>Raleigh           NC    27602 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br><br>G.S. 1A-1, Rules 3 and 4 |

| VERSUS | |
|---|---|
| *Name Of Defendant(s)*<br>North Carolina Department of Adult Correction, North Carolina Department of Public Safety, Denise Jackson, Todd Ishee,<br><br>Brandeshawn Harris, Todd Young, Kyle Hoover, Latisha Harvey, Nakisha Faust, Tony Taylor, Robert Stephenson, et al. | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1*<br>NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY<br>c/o Ashby T. Ray, Chief Deputy General Counsel<br>Archdale Building, 14th Floor, 512 N. Salisbury Street<br>Raleigh         NC    27604 | *Name And Address Of Defendant 2* |
|---|---|

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name and Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*<br>James T. Johnson<br>DeMent Askew Johnson & Marshall<br>P.O. Box 711<br>Raleigh        NC    27602 | *Date Issued*  9/6/2024  2:16:27 pm  ☐ AM ☒ PM<br><br>*Signature*  /s/ Tasha O'neal<br><br>☐ Deputy CSC  ☒ Assistant CSC  ☐ Clerk Of Superior Court |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement*    *Time*  ☐ AM ☐ PM<br><br>*Signature*<br><br>☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

| | |
|---|---|
| ANGELA CARTER as Administrator of THE ESTATE OF RONALD STACEY RHODES, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| NORTH CAROLINA DEPARTMENT OF ADULT CORRECTION, NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, DENISE JACKSON, TODD ISHEE, BRANDESHAWN HARRIS, TODD YOUNG, KYLE HOOVER, LATISHA HARVEY, NAKISHA FAUST, TONY TAYLOR, ROBERT STEPHENSON, DAVID MAROUCHOC, DEVEN MCKENNA, GERMEL WILKINS, DEMETRIA HORTON, RICHARD WIGGINS, AMY LAFLUER, JEREMIKA MCCLAMMY, ERICA COLLORA, UZOMA IWUALA, ERIN OATES, DANIEL BROOKS, JOSHUA HEIGHT, RICHARD BRAMMER, CHELSEY EDWARDS, DARNELL WINDLEY, CHRISTINA RANSON, EMMANUEL IBARRA, LESLYANN PINDER, MICHAEL COPELAND, NATASHA LYNCH, PATRICK REAVES, SHANE RAY, DOROTHY LEE JOYNER, TEN BROEK (FNU), W. RICHARDSON (FNU), ONOH (FNU), AMERSON (FNU), BENMBARK (FNU), MEWBORN (FNU), BOOTH (FNU), WHITE (FNU), REAVES (FNU), CUSTODIO (FNU), JOHN DOE and JANE DOE, all of the individually named Defendants in this caption are being sued Individually, and also in their Official Capacities as to Constitutional Claims, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT**

Plaintiff, complaining of Defendants, alleges and says as follows:

**PARTIES**

1.     Ronald Stacey Rhodes ("Mr. Rhodes" or "Decedent"), Plaintiff's intestate, died on September 9, 2022. At the time of his death and at all times referenced herein, Mr. Rhodes was a citizen and resident of Knightdale, Wake County, North Carolina. Mr. Rhodes died as a result of multiple stab wounds at the hands of other inmates at Central Prison in Raleigh, North Carolina while he was being held there as a Safekeeper for additional protection and security while he was awaiting trial in Wake County on pending charges. Mr. Rhodes had not been convicted of the crimes for which he had been charged.

2.     Plaintiff Angela Carter is the Administrator of the Estate of Ronald Stacey Rhodes and is the mother of Mr. Rhodes. Plaintiff Angela Carter ("Ms. Carter" or "Plaintiff") is a citizen and resident of Apex, Wake County, North Carolina. Letters of Administration were duly executed, and Plaintiff was named the Administrator of the Estate of Ronald Stacey Rhodes on or about January 31, 2023.

3.     Upon information and belief, Defendant North Carolina Department of Adult Correction ("NCDAC") is the North Carolina state agency responsible for corrections within the state of North Carolina, including housing offenders and Safekeepers. NCDAC was formed as a separate cabinet level agency at the start of 2023.

4.     Upon information and belief, prior to 2023, and specifically at the time of Mr. Rhodes' death and during other relevant time periods referenced herein, the Division of Adult Correction was a division within the North Carolina Department of Public Safety ("NCDPS") and, therefore, NCDPS was the state agency responsible for corrections within the state of North Carolina.

2

5.     Central Prison is a medium and maximum-security prison located at 1300 Western Boulevard, Raleigh, North Carolina. Central Prison is operated by NCDAC and, upon information and belief, was being operated by NCDPS at the time of Mr. Rhodes' death.

6.     NCDAC and NCDPS are both located in Raleigh, North Carolina. NCDAC and NCDPS are agencies of the State of North Carolina. (NCDAC and NCDPS are hereinafter sometimes collectively referred to as "Facility Defendants").

7.     Upon information and belief, Defendant Denise Jackson ("Jackson") is a citizen and resident of McDowell County, North Carolina. At all times referenced herein, Defendant Jackson was employed by Facility Defendants as the Warden of Central Prison. Defendant Jackson is being sued individually, and in her official capacity as Warden of Central Prison with regard to the constitutional claims asserted herein.

8.     Upon information and belief, Defendant Todd Ishee ("Ishee") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Ishee was employed by Facility Defendants as the Commissioner of Prisons with NCDPS and then as the Secretary of NCDAC. Defendant Ishee is being sued individually, and in his official capacity as Commissioner of Prisons and Secretary of NCDAC with regard to the constitutional claims asserted herein.

9.     Upon information and belief, Defendant Brandeshawn Harris ("Harris") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Harris was employed by Facility Defendants as Interim Commissioner of Prisons. Defendant Harris is being sued individually, and in her official capacity as Interim Commissioner of Prisons with regard to the constitutional claims asserted herein.

10.    Upon information and belief, Defendant Todd Young ("Young") is a citizen and

3

resident of Wake County, North Carolina. At all times referenced herein, Defendant Young was employed by Facility Defendants as a Correctional Lieutenant at Central Prison, and he was the acting commander of Central Prison at the time of Mr. Rhodes' death. Defendant Young is being sued individually, and in his official capacity as Correctional Lieutenant at Central Prison with regard to the constitutional claims asserted herein.

11.     Upon information and belief, Defendant Kyle Hoover ("Hoover") is a citizen and resident of Wisconsin. At all times referenced herein, Defendant Hoover was employed by Facility Defendants as Correctional Lieutenant at Central Prison. Defendant Hoover is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Lieutenant at Central Prison only with regard to the constitutional claims asserted herein.

12.     Upon information and belief, Defendant Latisha Harvey ("Harvey") is a citizen and resident of Upper Marlboro, Maryland. At all times referenced herein, Defendant Harvey was employed by Facility Defendants as Correctional Lieutenant at Central Prison. Defendant Harvey is being sued individually as to all claims asserted against her, and in her official capacity as Correctional Lieutenant at Central Prison only with regard to the constitutional claims asserted herein.

13.     Upon information and belief, Defendant Nakisha Faust ("Faust") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Faust was employed by Facility Defendants as Associate Warden for Operations at Central Prison. Defendant Faust is being sued individually as to all claims asserted against her, and in her official capacity as Associate Warden for Operations at Central Prison only with regard to the constitutional claims asserted herein.

14.     Upon information and belief, Defendant Tony Taylor ("Taylor") is a citizen and

4

resident of Wake County, North Carolina. At all times referenced herein, Defendant Taylor was employed by Facility Defendants as Director and/or Supervisor at Central Prison. Defendant Taylor is being sued individually as to all claims asserted against him, and in his official capacity as a Director/Supervisor at Central Prison only with regard to the constitutional claims asserted herein.

15. Upon information and belief, Defendant Robert Stephenson ("Stephenson") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Stephenson was employed by Facility Defendants as Correctional Program Supervisor at Central Prison, and upon information and belief, he was the lone officer supervising the yard at the time of Mr. Rhodes' death. Defendant Stephenson is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Program Supervisor at Central Prison only with regard to the constitutional claims asserted herein.

16. Upon information and belief, Defendant David Marouchoc ("Marouchoc") is a citizen and resident of Johnston County, North Carolina. At all times referenced herein, Defendant Marouchoc was employed by Facility Defendants as a Correctional Officer III at Central Prison, and upon information and belief, he was in charge of the Gang Unit/Internal Affairs. Defendant Marouchoc is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Officer III at Central Prison only with regard to the constitutional claims asserted herein.

17. Upon information and belief, Defendant Deven McKenna ("McKenna") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant McKenna was employed by Facility Defendants as Correctional Case Manager at Central Prison. Defendant McKenna is being sued individually as to all claims asserted against him, and in his

official capacity as Correctional Case Manager at Central Prison only with regard to the constitutional claims asserted herein.

18.     Upon information and belief, Defendant Germel Wilkins ("Wilkins") is a citizen and resident of Johnston County, North Carolina. At all times referenced herein, Defendant Wilkins was employed by Facility Defendants as Correctional Program Supervisor at Central Prison. Defendant Wilkins is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Program Supervisor at Central Prison only with regard to the constitutional claims asserted herein.

19.     Upon information and belief, Defendant Demetria Horton ("Horton") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Horton was employed by Facility Defendants as Correctional Housing Unit Manager at Central Prison. Defendant Horton is being sued individually as to all claims asserted against her, and in her official capacity as Correctional Housing Unit Manager at Central Prison only with regard to the constitutional claims asserted herein.

20.     Upon information and belief, Defendant Richard Wiggins ("Wiggins") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Wiggins was employed by Facility Defendants as Correctional Program Director at Central Prison. Defendant Wiggins is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Program Director at Central Prison only with regard to the constitutional claims asserted herein.

21.     Upon information and belief, Defendant Amy LaFluer ("LaFluer") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant LaFluer was employed by Facility Defendants as Correctional Programs Director at Central Prison.

6

Defendant LaFluer is being sued individually as to all claims asserted against her, and in her official capacity as Correctional Programs Director at Central Prison only with regard to the constitutional claims asserted herein.

22.     Upon information and belief, Defendant Jeremika McClammy ("McClammy") is a citizen and resident of Wake County, North Carolina.  At all times referenced herein, Defendant McClammy was employed by Facility Defendants as Correctional Sergeant at Central Prison.  Defendant McClammy is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

23.     Upon information and belief, Defendant Erica Collora ("Collora") is a citizen and resident of Randolph County, North Carolina.  At all times referenced herein, Defendant Collora was employed by Facility Defendants as Correctional Sergeant at Central Prison.  Defendant Collora is being sued individually as to all claims asserted against her, and in her official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

24.     Upon information and belief, Defendant Uzoma Iwuala ("Iwuala") is a citizen and resident of Wake County, North Carolina.  At all times referenced herein, Defendant Iwuala was employed by Facility Defendants as Correctional Sergeant at Central Prison.  Defendant Iwuala is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

25.     Upon information and belief, Defendant Erin Oates ("Oates") is a citizen and resident of Alamance County, North Carolina.  At all times referenced herein, Defendant Oates

was employed by Facility Defendants as Correctional Sergeant at Central Prison. Defendant Oates is being sued individually as to all claims asserted against her, and in her official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

26. Upon information and belief, Defendant Daniel Brooks ("Brooks") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Brooks was employed by Facility Defendants as Correctional Sergeant at Central Prison. Defendant Brooks is being sued individually as to all claims asserted against her, and in his official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

27. Upon information and belief, Defendant Joshua Height ("Height") is a citizen and resident of Nash County, North Carolina. At all times referenced herein, Defendant Height was employed by Facility Defendants as Correctional Sergeant at Central Prison. Defendant Height is being sued individually as to all claims asserted against him, and in his official capacity as Correctional Sergeant at Central Prison only with regard to the constitutional claims asserted herein.

28. Upon information and belief, Defendant Richard Brammer ("Brammer") is a citizen and resident of Nash County, North Carolina. At all times referenced herein, Defendant Brammer was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Brammer is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

29. Upon information and belief, Defendant Chelsey Edwards ("Edwards") is a

8

citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Edwards was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Edwards is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

30. Upon information and belief, Defendant Darnell Windley ("Windley") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Windley was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Windley is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

31. Upon information and belief, Defendant Christina Ranson ("Ranson") is a citizen and resident of Horry County, South Carolina. At all times referenced herein, Defendant Ranson was employed by Facility Defendants as a Correctional Case Manager at Central Prison. Defendant Ranson is being sued individually as to all claims asserted against him, and in her official capacity as a Correctional Case Manager at Central Prison only with regard to the constitutional claims asserted herein.

32. Upon information and belief, Defendant Emmanuel Ibarra ("Ibarra") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Ibarra was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Ibarra is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

9

33. Upon information and belief, Defendant Leslyann Pinder ("Pinder") is a citizen and resident of Wake County, North Carolina. At all times referenced herein, Defendant Pinder was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Pinder is being sued individually as to all claims asserted against her, and in her official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

34. Upon information and belief, Defendant Michael Copeland ("Copeland") is a citizen and resident of Johnston County, North Carolina. At all times referenced herein, Defendant Copeland was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Copeland is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

35. Upon information and belief, Defendant Natasha Lynch ("Lynch") is a citizen and resident of Nash County, North Carolina. At all times referenced herein, Defendant Lynch was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Lynch is being sued individually as to all claims asserted against her, and in her official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

36. Upon information and belief, Defendant Patrick Reaves ("Reaves") is a citizen and resident of Lenoir County, North Carolina. At all times referenced herein, Defendant Reaves was employed by Facility Defendants as a correctional officer at Central Prison. Defendant Reaves is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional

10

claims asserted herein.

37.     Upon information and belief, Defendant Shane Ray ("Ray") is a citizen and resident of Wake County, North Carolina.  At all times referenced herein, Defendant Ray was employed by Facility Defendants as a correctional officer at Central Prison.  Defendant Ray is being sued individually as to all claims asserted against him, and in his official capacity as a correctional officer at Central Prison only with regard to the constitutional claims asserted herein.

38.     Upon information and belief, Defendant Dorothy Lee Joyner ("Joyner") is a citizen and resident of Wake County, North Carolina.  At all times referenced herein, Defendant Joyner was employed by Facility Defendants as Inmate Phone Investigator Supervisor at Central Prison.  Defendant Joyner is being sued individually as to all claims asserted against her, and in her official capacity as a Inmate Phone Investigator at Central Prison only with regard to the constitutional claims asserted herein.

39.     Upon information and belief, Defendants Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, Reaves, and Custodio are all citizens and residents of Wake County North Carolina.  Upon information and belief, all of these Defendants were working as correctional officers at Central Prison and assigned to Unit 2 on the day of the Attack referenced herein.  None of these Defendants' first names are currently known.  Their names will become known through discovery and Plaintiff will thereafter amend the Complaint to add their first names.  Defendants Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, Reaves, and Custodio are being sued individually as to all claims asserted against them and in their official capacities as Correctional Officers at Central Prison only with regard to the constitutional claims asserted herein.

11

40.     Defendants John Doe and Jane Doe are correctional officers yet to be identified and will be identified through the course of discovery.  Upon information and belief, in addition to committing the other wrongful acts alleged herein, Defendants John Doe and Jane Doe provided information regarding Mr. Rhodes' pending charges to his eventual assailants and instructed his eventual assailants to "get him." Defendants John Doe and Jane Doe are being sued individually and in their official capacity as correctional officers at Central Prison.  John Doe and Jane Doe are being sued pursuant to N.C. Gen. Stat. § 1-166.  Leave to amend to appropriately identify and name John Doe and Jane Doe will be requested once their identities are known.

41.     Defendants Jackson as Warden, Ishee as Commissioner of Prisons, Young as Correctional Lieutenant, Harris as Interim Commissioner of Prisons, Hoover as Correctional Lieutenant, Harvey as Correctional Lieutenant, Faust as Associate Warden for Operations, and Taylor as Director and/or Supervisor, were all in supervisory roles at or for Central Prison during all times alleged in the Complaint.  As such, they were responsible for the care, custody, and control of all inmates at Central Prison, including all offenders and Safekeepers.  They were responsible for the management and control of Central Prison and for the selection, training, assignment, placement, promotion, and discipline of the Central Prison staff.  They were responsible for the system of complaint and investigation of staff misconduct and for setting standards by which misconduct complaints were reviewed.  They were responsible for issuing, implementing and enforcing the policies and procedures that have resulted in the deprivation of Mr. Rhodes' rights under federal law and has failed to take necessary actions to prevent such deprivations. Defendants Jackson, Ishee, Young, Harris, Hoover, Harvey, Faust, and Taylor are being sued individually as to all claims asserted against them, and in their official capacities only

12

with regard to the constitutional claims asserted herein, and they are hereinafter sometimes collectively referred to as "the Supervisory Defendants."

42. Defendants Stephenson as Correctional Housing Unit Manager, Marouchoc as Correctional Officer III and Gang Unit/Internal Affairs Officer, McKenna as Correctional Case Manager, Wilkins as Correctional Program Supervisor, Horton as Correctional Housing Unit Manager, Wiggins as Correctional Program Supervisor, LaFluer as Correctional Officer or "CO", McClammy as Correctional Sergeant or "Sergeant", Collora as Sergeant, Iwuala as Sergeant, Oates as Sergeant, Brooks as Sergeant, Height as Sergeant, Brammer as CO, Edwards as CO, Windley as CO, Ranson as CO, Ibarra as CO, Pinder as CO, Copeland as CO, Lynch as CO, Reaves as CO, Ray as CO, Joyner as CO and phone monitor supervisor, Ten Broek as CO, Richardson as CO, Onoh as CO, Amerson as CO, Benmbark as CO, Mewborn as CO, Booth as CO, White as CO, Reaves as CO, Custodio as CO, John Doe as CO, and Jane Doe as CO, all were employed at Central Prison and assigned correctional roles, duties, and responsibilities at all times alleged in the Complaint. Defendants Stephenson, Marouchoc, McKenna, Wilkins, Horton, Wiggins, LaFluer, McClammy, Collora, Iwuala, Oates, Brooks, Height, Brammer, Edwards, Windley, Ranson, Ibarra, Pinder, Copeland, Lynch, Reaves, Ray, Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, Reaves, Custodio, John Doe, and Jane Doe are all being sued individually as to all claims asserted against them, and in their official capacities only with regard to the constitutional claims asserted herein, and they are hereinafter sometimes collectively referred to as the "Correctional Staff Defendants."

43. All of the Supervisory Defendants and Correctional Staff Defendants are sometimes collectively referred to as the "Individually Named Defendants."

44. At all times alleged herein, all of the Individually Named Defendants were

13

employees and/or agents of the Facility Defendants, all being agencies of the State of North Carolina, and the Facility Defendants are liable for the acts and omissions of the Individually Named Defendants as hereinafter alleged under the doctrines of respondeat superior and agency.

45.     Defendants are being sued in their official capacities for negligence in a separate action before the Industrial Commission pursuant to the Tort Claims Act of North Carolina, N.C. Gen. Stat. § 143-291, et. al.

**WAIVER OF IMMUNITY**

46.     Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

47.     Upon information and belief, Defendants do not have governmental or sovereign immunity for any of the acts or omissions that are described herein and/or have consented to being sued for the claims asserted herein pursuant to the Tort Claims Act of North Carolina.

48.     In the alternative, should any of the Defendants ordinarily possess governmental and/or sovereign immunity from civil liability for any of the acts or omissions that are described herein, upon information and belief, Defendants are insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stats. § 153A-435, § 162-8, or other applicable state law with respect to all acts and omissions complained of herein, or participate in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintain a funded reserve and to such extent, Defendants have waived any official, sovereign, qualified or governmental immunity to which the might otherwise be entitled in their official capacities.

49.     Further, in committing the acts and omissions that are alleged herein, the Defendants have acted knowingly, maliciously, corruptly, and with a callous and reckless disregard and deliberate indifference for the rights of Mr. Rhodes, all of which justifies the

imposition of personal liability for the wrongful acts alleged herein, as well as an award of punitive damages against Defendants in their individual capacities.

## FACTS

### Background Regarding Ronald Stacey Rhodes.

50. Mr. Rhodes was born on August 24, 1987 in Raleigh, North Carolina. He was arrested on or about November 24, 2020 and confined at the Wake County Jail. He was 33 years old at the time. Prior to his confinement, Mr. Rhodes resided in Knightdale and was working as a cook at Chili's. Mr. Rhodes was never married, but he had three children. His oldest child is currently ten years old, and he has a five-year old son, and a three-year old son. At the time of his arrest in November 2020, Mr. Rhodes lived with, and was in a strong and loving relationship with, the mother of his two youngest children, Jasmine Davis. Mr. Rhodes and Ms. Davis were engaged to be married.

51. Mr. Rhodes and his mother, the Plaintiff in this action, Angela Carter, were also very close. They spoke or texted frequently. Ms. Carter saw her son on a regular basis and was actively involved in the lives of her grandchildren.

52. When Mr. Rhodes was 16 years old, he was convicted of second-degree kidnapping involving a 12-year-old. He was placed on the sex offender registry. Mr. Rhodes was again convicted of second-degree kidnapping and other charges in or around 2014. He was incarcerated for a period of time after this conviction.

53. As referenced above, on or about November 20, 2020, Mr. Rhodes was arrested for additional charges, including second-degree rape, stemming from prior incidents. At the time, Mr. Rhodes was living with his fiancé and children and working at Chili's.

54. Mr. Rhodes had been affiliated with a gang, but at the time of his last arrest in

November 2020, upon information and belief, he was not an active gang member.

55. In 2021, while he was being held at the Wake County Jail awaiting disposition of his pending charges, other inmates at Wake County Jail who were gang members became aware that Mr. Rhodes' pending charges were allegedly sex related. Per gang protocol, sex offenders are not allowed in gangs. This is well known among law enforcement and jail and correctional staff members.

56. Mr. Rhodes received threats from other gang-member inmates at the Wake County Jail. In or around November 2021, Mr. Rhodes was physically attacked by other gang-member inmates at the Wake County Jail. Mr. Rhodes suffered multiple injuries in this attack and required medical treatment, including stitches.

57. Mr. Rhodes and his mother, Angela Carter, both requested that the Jail move Mr. Rhodes to safekeeping at Central Prison so that he could be safely and securely housed separately from gang members. The Director of the Wake County Jail agreed.

58. On November 17, 2021, a Safekeeping Order pursuant to N.C. Gen. Stat. § 162-39 was entered in Wake County Superior Court ordering that Mr. Rhodes be transferred to Central Prison while he continued to await disposition of his pending charges. The order stated that this transfer was necessary "for the defendant's safety in that the defendant presents management issues and concerns which put his safety at risk within the Wake County Detention Center." Several days thereafter, Mr. Rhodes was transferred to Central Prison so that he could be provided proper safety and security from other gang members.

**Safekeeping Statutes, Policies, and Procedures.**

59. North Carolina General Statute § 162-39 (b) (effective October 1, 2019 to December 31, 2022) states:

16

Whenever necessary to avoid a security risk in any county jail, or whenever prisoners are arrested in such numbers that county jail facilities are insufficient and inadequate for the housing of such prisoners, the resident judge of the superior court or any judge holding superior court . . . or any district court judge may order the prisoner transferred to a unit of the State prison system designated by the Secretary of Public Safety or his authorized representative. For purposes of this subsection, a prisoner poses a security risk if the prisoner:

1) Poses a serious escape risk;

2) **Exhibits violently aggressive behavior that cannot be contained and warrants a higher level of supervision;**

3) **Needs to be protected from other inmates, and the county jail cannot provide such protection;**

4) Is a female or a person 18 years of age or younger, and the county jail facility does not have adequate housing for such prisoners;

5) Is in custody at a time when a fire or other catastrophic event has caused the county jail facility to cease or curtail operations; or

6) **Otherwise poses an imminent danger to the staff of the county jail facility or to other prisoners in the facility.**

(Emphasis added).

60.     As referenced above, Mr. Rhodes was transferred to Central Prison pursuant to subsection (3) above, for the specific purpose of providing him safety and protection from harm by other inmates. Mr. Rhodes' safekeeping order stated as such, and all Defendants were aware of this.

61.     Often an inmate is classified as a Safekeeper and transferred to Central Prison pursuant to subsection (2) above, because that inmate is exhibiting violently aggressive behavior and cannot be contained, or subsection (6), because that inmate poses an imminent danger to staff and other prisoners.

62.     A clear and obvious need exists to keep the Safekeepers that have been transferred to Central Prison *because they are in need of protection from other inmates* separated

17

from the Safekeepers that have been transferred to Central Prison *because they are exhibiting violently aggressive behavior and pose an imminent danger to staff and other inmates*. However, the NCDPS and NCDAC policies and procedures woefully fail to provide this obviously necessary separation.

63.     NCDPS Policy & Procedures Chapter C Section .1600 is titled SAFEKEEPERS. Subsection .1604 titled, CONDITIONS OF CONFINEMENT, provides for the rules and regulations related to the housing and handling of Safekeepers. Section (a) of .1604 reads:

> Safekeepers must be housed separately from general population offenders, except when admission to a medical or mental health unit is required, or when the offender is convicted on other unrelated charges and has been committed to the Department of Public Safety.

64.     So, it is clear that the policy of NCDPS and NCDAC is to keep Safekeepers together, and separate from the general population offenders, but nowhere in this policy on Safekeepers is there ANY provision, rule, or regulation regarding the separation of Safekeepers whereby Safekeepers who need extra protection from other inmates are kept separate and apart from violently aggressive Safekeepers who the staff and other inmates are in need of protection from.

65.     Chapter C Section .1600 regarding Safekeepers also provides that "For safekeepers, conditions of confinement must be met as established in C.1200." Chapter C, Section .1200 is the NCDPS and NCDAC policy that generally covers conditions of confinement.

66.     Section .1201 (a)(6) covers and defines Safekeepers. As with the above-referenced policies, this policy establishes the classification of Safekeeper as an inmate awaiting trial who has been transferred from a county jail, and states that Safekeepers "shall" be housed separately from the general population, but again, makes no provision or attempt to separate out

18

the different classifications of Safekeepers, as explained above.

67.     Section .1204 covers Meals.  Section .1204 (c) provides Safekeepers can only receive their meals when separated from the general population offenders but makes no provision or attempt to separate the different classifications of Safekeepers.

68.     Section .1206 covers Exercise Periods.  Section .1206 (a) provides Safekeepers can have one hour per day of exercise but makes no provision or attempt to separate the different classifications of Safekeepers.

69.     Section .1201(a)(4) does provide for a separate classification of offender at Central Prison, labeled "Protective Control."  This classification is the status "to which offenders may be assigned separate from the general population in order to protect the offender from self-injury or the threat of harm by other offenders."

70.     Upon information and belief, all Safekeepers are classified in the Central Prison housing system as a "Safekeeper," regardless of their need for extra protection.  "Protective Control" is normally reserved for already convicted offenders in the general population that need extra protection.  Regardless, upon information and belief, despite Mr. Rhodes' clear need for additional protection, he was never classified by NCDPS or NCDAC as a Protective Control.

**The Assailants.**

71.     As referenced above, and as will be discussed in more detail below, on or about September 9, 2022, Mr. Rhodes was attacked and killed in the exercise yard at Central Prison. Five different assailants were involved in the attack: Alfred Logan ("Logan"), Quashon Williams ("Williams"), Markis Allen ("Allen"), Marquice Grant ("Grant"), and David Mitchell ("Mitchell")(hereinafter sometimes collectively referred to as "the assailants").  All five assailants were gang members and therefore were validated Security Threat Group (STG) (i.e.,

19

gang) members. All Defendants were well aware of the assailants' STG status. Mr. Rhodes was also in a gang, as all Defendants were well aware. However, because his charges were sex related, he was a clear and obvious target of violence at the hands of the other gang members. It was well known among all Defendants that sex offenders were not allowed in gangs and were targeted by gang members for physical and deadly attacks.

72.     Logan was the leader of the assailants and the instigator of the Attack on Mr. Rhodes.

73.     As with Mr. Rhodes, Logan was a Safekeeper. He had been arrested for murder in Buncombe County in or about December 2021. He had several other pending murder charges against him, two pending murder charges in Alabama and one in South Carolina, in addition to the Buncombe County pending murder charge.

74.     In April 2022, the Buncombe County District Attorney's Office filed a motion to classify Logan as a Safekeeper pursuant to N.C. Gen. Stat. § 162-39. In said motion, the District Attorney stated:

> That, upon information and belief, the Defendant [Logan] is a safety and security threat to the facility due to his gang activity with the bloods and threatening other inmates in the facility. There have been two separate assaults. He threatens inmates within the facility and then at a later date, the same person he threatened has been assaulted. Mr. Logan is already housed on a special unit and is not allowed free time with other inmates; however, he has still been able to give orders to other inmates to carry out assaults. Per the administrative staff at the detention facility, detainees will get in trouble on purpose to get moved to the floor where Defendant is, he will give the orders and then they move back up to the housing unit to carry out those orders.

> That the Defendant [Logan] is a security risk and poses a danger to other inmates in the Buncombe County Detention Facility and the State requests that the Defendant be transported by the Buncombe County Sheriff's Department to Central Prison for safekeeping.

75.     Upon information and belief, the Safekeeping Order was granted, and Logan

was transported to Central Prison as a Safekeeper, because he was deemed a dangerous and imminent safety and security threat to jail staff and other inmates.

76.     Assailant Grant was previously arrested in Greene County. In November 2020, he was transferred to Central Prison as a Safekeeper pursuant to a Safekeeping Order that stated Grant had: "Threaten to kill Administrative Assistant and staff, flooding cell, damaging county property, kicking on doors, throwing trash and feces out of trap door."

77.     Grant was subsequently transported to Central Prison as a Safekeeper, because he was deemed a dangerous and imminent safety and security threat to jail staff and other inmates.

78.     Upon information and belief, the other assailants, Williams, Allen, and Mitchell, were all transported from local county jails to Central Prison as Safekeepers because they were deemed a safety and security threat to jail staff and other inmates.

**The Attack.**

79.     On the morning of September 9, 2022, Mr. Rhodes was in the Central Prison "rec yard" for his one hour of recreational time. The rec yard is an enclosed, locked area. It is surrounded by high, chain-link fence, approximately 10 feet high. There were approximately 15 to 25 inmates in the rec area. Upon information and belief, all of the inmates were Safekeepers. However, there were Safekeepers in the rec yard at the time, like Mr. Rhodes, who had been clearly classified as needing extra protection from other inmates, and there were Safekeepers in the rec yard at the time, like Logan and the other assailants, who had been classified as known threats that the staff and other inmates needed protection from. No effort, of any kind, was taken by Defendants to keep these two classifications of Safekeepers separate from each other, or to otherwise protect the safety and welfare of Safekeepers who, per their safekeeping orders, were in need of protection.

21

80.     At the time, only one correctional officer was supervising the entire rec yard, Defendant Stephenson.  However, Defendant Stephenson was outside the enclosed chain-link fence.  No correctional officers patrolled or were within the chain-link enclosed area.

81.     Logan and the other assailants approached Mr. Rhodes.  The group began talking. The discussion was confrontational.  This confrontational encounter of at least five different inmates with Mr. Rhodes, should have been an immediate warning sign to Defendants that trouble was ensuing, especially given that it included Mr. Rhodes with his need for protection, and Logan with his extremely violent and aggressive history.  However, Defendants did not take any action to investigate, break up the encounter, or stop further escalation.

82.     Logan and the other assailants began hitting and assaulting Mr. Rhodes.

83.     Mr. Rhodes was able to escape and run away.  He ran directly to Correctional Officer Stephenson; however, Stephenson was on the other side of the chain-link fence and was not able or willing to offer meaningful assistance.

84.     Logan and the other assailants easily caught up with Mr. Rhodes.  Logan and one other assailant had makeshift knives.  They began stabbing Mr. Rhodes repeatedly.  Mr. Rhodes had an injured knee at the time and had been issued a cane.  One of the assailants took Mr. Rhodes cane from him and began beating him with the cane.

85.     One of Logan's knife thrusts was a deep puncture stab directly into the left side of Mr. Rhodes' chest.  Logan and the other assailants continued to stab Mr. Rhodes unchecked until he fell to the ground.  After he fell to the ground, the assailants continued to kick, punch, and stab him.

86.     All of this was occurring within a few feet from Defendant CO Stephenson. However, Stephenson was on the other side of the fence.  He initially did not do anything other

than watch the assault occur. After a few moments, he pulled his pepper spray out and tried to spray the assailants. One of the assailants was hit with some pepper spray and backed away. Nevertheless, the assault continued unchecked until Mr. Rhodes lay motionless on the ground. ("the Attack").

87. One of the assailants tried to throw one of the knives over the fence. Another assailant threw one of the knives down a drain.

88. Minutes went by and eventually other correctional officers enter the rec yard. Even though Mr. Rhodes was laying motionless on the ground, the COs first approached the assailants and placed them in handcuffs.

89. Thereafter, several COs approached Mr. Rhodes. Despite the fact that he was clearly injured, unable to move, unconscious, and unresponsive, the COs tried to get Mr. Rhodes up and put handcuffs on him. Eventually, a supervising CO came into the rec yard and told the other COs to put Mr. Rhodes back down on the ground.

90. They eventually began performing CPR on him, and, at some point, medical staff was called in. Wake County EMS was eventually called. The Attack occurred at or around 9:30 a.m. WakeMed Emergency Room records reflect he arrived at the hospital at 10:20 a.m. The Emergency Room doctor's notes state, "Patient was found unresponsive without a pulse for approximately 1 hour and 15 minutes."

91. Mr. Rhodes was pronounced dead. Mr. Rhodes was 35 years old at the time of his death. The subsequent autopsy confirmed Mr. Rhodes died as a direct result of the stab wounds suffered during the Attack.

92. All Defendants, and specifically including but not limited to Defendants Young, Marouchoc, Collora, Iwuala, Oates, Brooks, Brammer, Hoover, Ray, and Stephenson,

23

negligently failed to render aid to Mr. Rhodes and /or call 911 in a timely fashion.

**Knowledge, Involvement, Negligent and Malicious Conduct, and Deliberate Indifference of Defendants Prior to the Attack, During the Attack, and Immediately After the Attack.**

93. As previously stated, three different witnesses stated in post-Attack interviews conducted by the SBI that the staff at Central Prison were involved, planned, previously knew about, assisted, was responsible for, and/or ordered the Attack on Mr. Rhodes. Witness inmate Dayshawn Beckham said that "the 'police' [meaning staff] got to the victim and put a 'hit' out on the victim." He overheard a female correctional officer tell one of the assailants "get him" after sharing Mr. Rhodes charging information with inmates. Witness inmate Edward Wright also stated that Rhodes' charges were shared by a correctional officer earlier in the week. Assailant/witness David Mitchell stated, "*the correctional officers were helping them,*" and "*the correctional officers are on the payroll for the gang and they help them out be weeding out who the sex offenders are and who the snitches are and then sharing that information with the gang members*." Mitchell said, "*every correctional officer on that day shift basically does it*."[1]

94. All of the Supervisory Defendants identified herein, and all of the Correctional Staff Defendants identified herein, were employed at Central Prison and on duty on the day of the Attack or during the week of the Attack.

95. All of the Supervisory Defendants identified herein, and all of the Correctional Staff Defendants identified herein, were aware of the fact that the assailants had been transferred to Central Prison as Safekeepers because they were gang members, and they were deemed a safety and security threat to jail staff and other inmates.

---

[1] Accordingly, all correctional officers and correctional supervisors who, upon information and belief, were working on or around Mr. Rhodes' unit during the week of the Attack are responsible and have been named as defendants individually and in their official capacities.

24

96.     All Supervisory Defendants and Correctional Staff Defendants were aware that Mr. Rhodes had been transferred to Central Prison as a Safekeeper because he was a target and needed extra protection from violence at the hands of other inmates, specifically including gang members.

97.     All Supervisory Defendants and Correctional Staff Defendants were aware that Mr. Rhodes and all the assailants were gang members.  All Defendants were aware of Mr. Rhodes' status as a sex offender.  All Defendants were aware that sex offenders were not allowed in gangs and that therefore Mr. Rhodes was a clear target for violence at the hands of other gang member inmates, specifically including the assailants.

98.     Upon information and belief, Mr. Rhodes was housed in Unit 2E, which only housed Safekeepers.  However, as referenced above, there was no separation between the Safekeepers who were at Central Prison because they were in need of extra safety and protection from the Safekeepers who were at Central Prison because they were a known and violent threat to other inmates.

99.     Only days before the Attack, a third-party inmate, Dayshawn Beckham, overheard a female correctional officer tell other inmates, upon information and belief including but not limited to one or more of the assailants, that Mr. Rhodes had sex related charges against him and had previously been convicted of sex related charges.  This third-party inmate then heard the female correctional officer say, "get him."

100.    Assailant Mitchell stated in his post-attack interview that all of the correctional officers at Central Prison were helping them because the COs wanted to weed out the sex offenders.  He said the COs tell them who the sex offenders are because the COs want to weed them out.  Mitchell stated that all COs on the day shift do it.

25

101.    Prior to the Attack, Logan met with other gang-member inmates to discuss the hit on Rhodes.  Other gang members had meetings to discuss the hit on Rhodes. These meetings were in the open and for all correctional officers to see.  The Defendants, specifically Defendant Marouchoc, are trained to detect and stop gang-related activity.    These meetings gave Defendants clear notice that a gang-related hit was imminent.  Defendants did nothing to investigate or stop the planned Attack.

102.    Prior to the Attack, various gang members, including some of the assailants, requested transfers to a different unit, and/or got in trouble intentionally to be transferred to a different unit, so they could discuss with other gang members, including some of the assailants, the planned hit on Rhodes.  This is a known and obvious tactic used by gang members to plan a hit.  These gang-related tactics and transfer activities put Defendants on clear notice that a gang-related hit was imminent.  Defendants did nothing to investigate or stop the planned Attack.

103.    The day before the Attack, Mr. Rhodes messaged with his fiancé, "well I love you good night take care of my son bae . . .  pray for me and my safety tomorrow."  Upon information and belief, Mr. Rhodes had sent other messages to his fiancé that clearly indicated something was going to happen to him and that his safety was at risk.  Defendants, including but not limited to Defendants Joyner and Taylor, monitor messages sent by inmates for the specific purpose of detecting potential safety threats and/or concerns.  These messages clearly indicated that a hit on Rhodes was imminent.  Despite being on notice, Defendants did nothing to investigate or try to prevent the Attack.

104.    On the morning of the Attack, Mr. Rhodes messaged his fiancé, "good morning bae pray for my safety today. . . I hope gray is good .. If I don't call you before 12 that means something happened to me .. so call me mom and yo call up here asap I love you." Defendants,

including but not limited to Defendants Joyner and Taylor, monitor messages sent by inmates for the specific purpose of detecting safety threats and/or concerns. These messages clearly indicated that a hit on Rhodes was imminent. Despite being on notice, Defendants did nothing to investigate or try to prevent the Attack.

105. Mr. Rhodes messaged with other friends/family during the days leading up to the attack, including but not limited to Laura Nicole Brown, expressing grave concern for his safety and that clearly indicated a hit was imminent. In some of the messages, Mr. Rhodes expressed concern specifically about "Fox," which is the gang nickname for assailant Logan. All Defendants were aware of this. Defendants, including but not limited to Defendants Joyner and Taylor, monitor messages sent by inmates for the specific purpose of detecting safety threats and/or concerns. These messages clearly indicated that a hit on Rhodes was imminent, and that Logan was going to be involved. Despite being on notice, Defendants did nothing to investigate or try to prevent the Attack.

106. In his post attack interview, Logan said he stabbed Rhodes exactly where he knew he needed to stab him to kill him. Logan insinuated in his interview that the correctional officers knew that if they put him together with Rhodes, he was going to kill Rhodes.

107. All of the Defendants knew Rhodes was a sex offender. All of the Defendants knew that Logan was at Central Prison for multiple murder charges and that he had been putting hits on other inmates at the local jail. All of the Defendants knew that Rhodes and Logan, and the other assailants were gang members. All of the Defendants knew that sex offenders were not allowed in gangs and that therefore Rhodes was a target.

108. NCDPS, NCDAC, and all Supervisory Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate

indifference to the rights and safety of Mr. Rhodes and others by failing to enact appropriate policies and procedures to ensure that *Safekeepers who were transferred to Central Prison because they were in need of special protection from attacks at the hands of fellow inmates* separate and apart from the *Safekeepers who were transferred to Central Prison because there were violent, dangerous, and an imminent threat to the safety of staff and other inmates*.

109.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to abide by and adhere to policies and procedures enacted to ensure that *Safekeepers who were transferred to Central Prison because they were in need of special protection from attacks at the hands of fellow inmates* separate and apart from the *Safekeepers who were transferred to Central Prison because there were violent, dangerous, and an imminent threat to the safety of staff and other inmates*.

110.    NCDPS, NCDAC, and all Supervisory Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to classify Mr. Rhodes as needing Protective Control when it was clear and obvious that he was in need of special protection from attacks at the hands of fellow inmates.

111.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to abide by and adhere to policies and procedures enacted to ensure Mr. Rhodes was provided adequate safety and security from attack

28

by fellow inmates, including but not limited to adhering to Mr. Rhodes classification as Protective Control.

112. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by otherwise failing to act on, and/or respond to, clear and obvious signs and indications that an assault against Mr. Rhodes was imminent and going to occur, including but not limited to unusual gang activity among Logan and the other assailants, and obvious phone conversations and messaging indicating that an assault was going to occur.

113. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to take any action in response to the information being relayed among inmates and between inmates and COs that Logan and the other assailants were aware that Mr. Rhodes' charges were sex related, and knowing that gangs did not allow sex offenders in their ranks, and knowing that Logan and the other assailants had commenced a target on Mr. Rhodes for a violent and deadly assault.

114. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by intentionally providing information to inmates, including the assailants, regarding Mr. Rhodes' pending sex-related charges and prior sex-related

29

convictions, knowing that Mr. Rhodes would immediately thereafter be the target of an attack.

115. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by creating an atmosphere and environment whereby COs regularly provided gang-member inmates charging information on sex offender inmates for the purpose of inflicting punishment on the sex offender inmates and/or for the purpose of weeding out the sex offender inmates.

116. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by intentionally moving the assailants into a unit allowing them to be in the rec yard together with Mr. Rhodes, knowing that the assailants were going to attack Mr. Rhodes and knowing that they did not have proper procedures and protections in place to prevent violent attacks.

117. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to provide any oversight or security in the rec yard on the day of the Attack, except for one CO stationed on the outside of the fence, despite knowledge that an attack was imminent and going to occur.

118. NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were

30

negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by creating an atmosphere and environment whereby inmates were allowed to possess and carry from unit to unit dangerous and lethal weapons.

119.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by allowing Logan and the other assailants to possess and carry from unit to unit dangerous and lethal weapons on the day of the Attack.

120.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by creating an atmosphere and environment whereby gang-member inmates were allowed to control and manage the movement and placement of other inmates.

121.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by specifically allowing Logan and the other assailants, who were all gang-members, to control and manage the movement and placement of other inmates.

122.    NCDPS, NCDAC, all Supervisory Defendants (in their individual and official capacities) and all Correctional Staff Defendants (in their individual and official capacities) were

31

negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others by failing to provide timely aid and/or call for medical attention to Mr. Rhodes after the Attack, despite knowledge that an attack was imminent and going to occur, specifically including but not limited to Defendants Young, Marouchoc, Collora, Iwuala, Oates, Brooks, Brammer, Hoover, Ray, and Stephenson.

**Damages.**

123. As a direct and proximate result of Defendants' actions and inactions as alleged herein, Mr. Rhodes was brutally stabbed and beaten at the hands of the assailants, which caused Mr. Rhodes' death. Mr. Rhodes was 35 years old at the time of his death. He leaves behind a loving mother, fiancé, and three young children.

124. Decedent experienced severe physical pain and mental suffering, anxiety, and distress prior to his death, and his Estate has incurred funeral expenses as a result of the inactions and actions of Defendants.

125. In addition, Decedent's family has been deprived of the services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices and advices of Decedent.

126. As a direct and proximate result of Defendants' actions, the Estate of Ronald Stacey Rhodes, Angela Carter, Administrator, has been damaged both generally and specially in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00). The Estate of Ronald Stacey Rhodes, Angela Carter, Administrator, is entitled to recover damages for all those matters set forth in N.C. Gen. Stat. § 28A-18-2(b) which is incorporated by reference as if fully set forth herein.

127. As a result of Decedent's death, Plaintiff is also entitled to recover all damages allowed by Federal and North Carolina law for violation of 42 U.S.C. § 1983, including

32

reasonable compensation for attorney's fees pursuant to 42 U.S.C. § 1983.

128.     Plaintiff is also seeking punitive damages against Defendants because the conduct set forth herein constitutes malicious conduct, deliberate indifference, willful and wanton conduct, and intentional conduct towards Decedent which caused his death.

## FIRST CLAIM FOR RELIEF
### (Negligence Claim Against All Individually Named Defendants)

129.     Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

130.     At all times relevant hereto, all Supervisory Defendants (in their individual capacities) and all Correctional Staff Defendants (in their individual capacities) owed Decedent a duty to exercise reasonable care in performing their duties in such a way as to avoid placing Decedent and others in unreasonable danger of serious injury or death.

131.     All Supervisory Defendants (in their individual capacities) and all Correctional Staff Defendants (in their individual capacities) also owed a duty to exercise reasonable care in ensuring that Decedent and others would be free from inhumane conditions, free from cruel and unusual punishment, free from unreasonable searches and seizures, and free from being the victim of a deliberate indifference to his life, safety, and wellbeing at the hands of the correctional officers, fellow inmates, other officers, and agents of NCDPS and NCDAC.[2]

132.     Said Defendants breached the duties they owed to Decedent, and were negligent,

---

[2] While N.C. Gen. Stat. § 143-291 provides that the Industrial Commission is the exclusive forum for negligence claims against state employees acting within the course and scope of their employment, the Individually Named Defendants are being sued herein in their individual capacities to the extent that Defendants admit, or it is later determined, that during some or all of the times referenced herein, some or all of the Individually Named Defendants were acting outside the course and scope of their employment.

33

in the following respects:

    a. In the ways specifically set forth in Paragraphs 93-122, and 132, above, which are fully incorporated herein by reference;

    b. They failed to establish reasonable and appropriate policies to accomplish the legitimate mission of protecting and serving the general public, including Decedent;

    c. They failed to establish reasonable, appropriate, and effective policies regarding the hiring, promotion, and retention of its deputies, officers, and agents;

    d. They failed to provide adequate training, supervision, and instruction to its correctional officers, supervisors, and other officers;

    e. They failed to adequately staff Central Prison with sufficient COs and other officers and employees to properly manage and oversee the inmates;

    f. They failed to establish reasonable, appropriate, and effective policies and procedures governing proper handling, housing, and monitoring of gang-member inmates and prevention of gang violence;

    g. They failed to establish reasonable, appropriate, and effective policies and procedures governing possession of deadly weapons, including knives, by inmates;

    h. They failed to ensure that their COs and other officers and employees at Central Prison were complying with existing policies and procedures;

    i. They negligently hired and/or promoted deputies and officers who they knew, or should have known, lacked the reasonable care, prudence, discretion, and competence necessary for effective and lawful execution of their duties;

    j. They failed to properly and adequately monitor, supervise, and review the activities of their COs, other officers and employees at Central Prison;

    k. In all ways set forth above in this Complaint;

    l. In other ways to be established through discovery and at trial.

133. As a direct and proximate result of the aforesaid negligence and misconduct of all Supervisory Defendants (in their individual capacities) and all Correctional Staff Defendants (in their individual capacities) Plaintiff has sustained damages in an amount in excess of Twenty-

34

Five Thousand and No/100 Dollars ($25,000.00), including for pain and suffering prior to his death, lost earnings, medical expenses, and wrongful death damages.

**SECOND CLAIM FOR RELIEF**
**(Gross Negligence and Malicious Conduct as to Individually Named Defendants)**

134.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

135.    This claim is being brought against all the Supervisory Defendants (in their individual capacities) and all the Correctional Staff Defendants (in their individual capacities).

136.    The Supervisory Defendants and the Correctional Staff Defendants committed gross negligence, willful and wanton conduct, and malicious conduct all in the performance of their duties owed to Decedent as specifically set forth in paragraphs 93 through 122, and 132, above.

137.    The Supervisory Defendants and the Correctional Staff Defendants committed gross negligence, willful and wanton conduct, and malicious conduct all in the performance of their duties owed to Decedent in other ways as set forth in this Complaint.

138.    The conduct of said Individually Named Defendants was purposeful, and the actions were taken with the knowledge that it constituted a breach of their duties to observe and honor the rights and safety of others.

139.    Said Individually Named Defendants' actions were carried out needlessly and maliciously, manifesting a conscious and reckless disregard of, and deliberate indifference to, the rights and safety of others.

140.    As a direct and proximate result of the aforesaid gross negligence and malicious conduct of Defendants, Plaintiff has sustained damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), including for pain and suffering prior to his death,

35

lost earnings, medical expenses, and all wrongful death damages.

141.    An award of punitive damages is warranted to punish Defendants' egregious conduct and to deter Defendants and others from engaging in similar conduct.

**THIRD CLAIM FOR RELIEF**
**(Defendants' Violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Other Constitutional Violations, Pursuant to 42 U.S.C. § 1983)**

142.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

143.    At all relevant times alleged herein, the Individually Named Defendants (in their individual and official capacities) were acting within the course and scope of their agency, employment, and/or supervisory roles with Defendants NCDPS and NCDAC. This claim is brought against the Individually Named Defendants in their official and individual capacities pursuant to 42 U.S.C. § 1983.

144.    At all times alleged herein, Decedent had the following clearly established, inalienable, constitutional rights that are secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution:

     a.   The right to be free from cruel and unusual punishment;

     b.   The right to be free from a deliberate indifference to the safety and wellbeing of his person and his life;

     c.   The right to be free from a deliberate indifference to his serious medical needs;

     d.   The right to be free from deprivation of life and liberty without due process of law;

     e.   The right to be free from arbitrary government action which is so outrageous as to shock the conscience of a civilized society;

     f.   The right to be free from summary punishment; and

36

g. Such other rights as may be established during the course of discovery or trial of this action.

145. The Individually Named Defendants named herein were deliberately indifferent to, intentionally ignored, and disregarded the safety, health, and wellbeing of Decedent while Decedent was in their custody and control, which led to or caused the death of Decedent and thereby deprived Decedent of these inalienable, constitutional rights.

146. The specific actions and omissions of the Individually Named Defendants constituting said constitutional violations are described above, including in paragraphs 93 through 122, and 132, above, which paragraphs are fully incorporated herein by reference, and will be further established in other ways through discovery and/or at trial, but include the following unconstitutional and deliberately indifferent conduct:

a. They were aware that Decedent was in imminent danger of serious bodily harm and/or death yet ignored all warnings, failed to provide adequate protections to attempt to keep him safe, failed to keep him safe, failed to prevent and stop the deadly attack described above, and failed to provide adequate and appropriate care to Decedent during and after the attack;

b. They failed to establish appropriate policies to accomplish the legitimate mission of protecting and serving the general public, and specifically Decedent, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

c. They failed to establish appropriate and effective policies regarding the hiring, promotion, and retention of its deputies, officers, and agents, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

d. They failed to provide adequate training, supervision, and instruction to its correctional officers, supervisors, and other officers, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his rights;

e. They failed to adequately staff Central Prison with sufficient COs and other officers and employees to properly manage and oversee the inmates; despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

37

f. They failed to establish reasonable, appropriate, and effective policies and procedures governing proper handling of gang-member inmates and prevention of gang violence, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

g. They failed to establish reasonable, appropriate, and effective policies and procedures governing possession of deadly weapons, including knives, by inmates, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

h. They failed to ensure that their COs and other officers and employees at Central Prison were complying with existing policies and procedures, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

i. They negligently hired and/or promoted deputies and officers who they knew, or should have known, lacked the reasonable care, prudence, discretion, and competence necessary for effective and lawful execution of their duties, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

j. They failed to properly and adequately monitor, supervise, and review the activities of their COs, other officers and employees at Central Prison, despite knowledge that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights;

k. They assisted the assailants referenced above by providing information to them in such a way as to provoke an attack, failed thereafter to intervene, and allowed the attack to occur.

l. In all ways set forth above in this Complaint;

m. In other ways to be established through discovery and at trial.

147. The Individually Named Defendants named herein committed these constitutional violations and deprivations under color of law, and while working within the course and scope of their employment with the Defendants NCDPS and NCDAC. At the time the Individually Named Defendants committed these constitutional deprivations, it was clear to them, and would

have been clear to any reasonable person, that their actions were violating Decedent's constitutional rights.

148.    In committing these constitutional violations, the Individually Named Defendants acted maliciously, corruptly, and with a willful and wanton disregard for the rights and safety of Decedent and the general public, all of which justifies the imposition of personal liability against the Individually Named Defendants and an award of punitive damages.

149.    As a direct and proximate result of the aforesaid wrongful actions and inactions, constitutional violations, civil rights violations, and misconduct of Defendants, jointly and severally, Plaintiff has sustained damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), including pain and suffering prior to his death, lost earnings, medical expenses, and wrongful death damages.

### FOURTH CLAIM FOR RELIEF
**(Defendants' Supervisory Violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Other Constitutional Violations, Pursuant to 42 U.S.C. § 1983)**

150.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

151.    In addition to the above, the Supervisory Defendants and the Correctional Staff Defendants with decision-making authority are further liable for the constitutional violations above based on the principles set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978); and *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).

152.    The Supervisory Defendants and Correctional Staff Defendants with decision-making authority, acting on behalf of NCDPS and NCDAC, are liable to Decedent because their policies, practices, customs, and/or usages are the direct and proximate cause of Decedent's injuries, losses, and death.

39

153.     Based on information and belief, these Supervisory Defendants and Correctional

Staff Defendants with decision-making authority, acting on behalf of NCDPS and NCDAC,

acted with deliberate indifference, gross negligence, maliciousness, and reckless disregard to the

safety, security, and constitutional and statutory rights of Decedent, the public, and the Plaintiff,

as well as others similarly situated.     In violation of Decedent's rights, these Defendants

maintained, enforced, tolerated, permitted, acquiesced in, and applied the following policies,

practices, or customs:

    a.  Failed to have any policies adequately addressing how to house the different
        categories of Safekeepers;

    b.  Failed to implement protocols and train their COs, supervisors, and other staff
        regarding proper housing of the various categories of Safekeepers;

    c.  Failed to adequately train, supervise, and control their COs, supervisors, and
        employees, including but not limited to the Individually Named Defendants,
        in proper security measures and maintaining control over gang members and
        gang violence;

    d.  Failed to adequately train, supervise, and control their COs, supervisors, and
        employees, including but not limited to the Individually Named Defendants,
        in following and adhering to policies and procedures that were intended to
        ensure the safety and wellbeing of inmates confined to their custody;

    e.  Condoned and tacitly encouraged their COs, supervisors, and employees,
        including but not limited to the Individually Named Defendants, to provide
        charging information of sex offenders to gang members as punishment or to
        weed out the sex offenders;

    f.  Condoned and tacitly encouraged their COs, supervisors, and employees,
        including but not limited to the Individually Named Defendants, to violate
        NCDPS and NCDAC policies and procedures regarding the control of gang
        member inmates, the control of contraband weapons, and the proper safety
        protocols when dealing with Safekeepers;

    g.  Condoned and tacitly encouraged their COs, supervisors, and employees,
        including but not limited to the Individually Named Defendants, to violate
        NCDPS and NCDAC policies and procedures that were intended to ensure the
        safety and wellbeing of inmates confined to their custody;

h. Failing to properly train and/or supervise their COs, supervisors, and employees, including but not limited to the Individually Named Defendants, in the performance of their duties;

i. Failing to properly hire, train, and supervise their COs, supervisors, and employees, including but not limited to the Individually Named Defendants, in regard to appropriate interaction with inmates;

j. Failing to adequately discipline and/or retrain officers involved in misconduct;

k. Upon information and belief, hiring, retaining, and assigning officers with demonstrable propensities for excessive force, violence, dishonesty, and other misconduct;

l. Condoning officers in the belief and/or tacitly encouraging officers to believe that they can violate the rights of persons such as Mr. Rhodes with impunity, and that such conduct will not adversely affect their opportunities for promotion, retaining their employment, retaining their law enforcement certification, and retaining other important benefits of their employment and/or status as law enforcement officers;

m. Failing to properly recruit, train, supervise, and/or discipline its deputies, investigators, sergeants, and officers;

n. Engaged in the conduct herein despite a known history of similar violent attacks; and

o. In other ways to be established through discovery and at trial.

154. These Defendants acted as such despite being on notice that Decedent was in imminent danger, and that failure to so act would violate his constitutional rights.

155. These Defendants, including all decision makers herein, acting on behalf of NCDPS and NCDAC, knew, or reasonably should have known, that their COs, supervisors, and other employees, including but not limited to the Individually Named Defendants, would fail to adequately provide safety to Decedent in light of the facts and circumstances set forth herein, thereby ignoring his serious needs, and violating his Federal and State Constitutional Rights.

156. These Defendants, including all decision makers herein, acting on behalf of NCDPS and NCDAC, were deliberately indifferent to the obvious safety needs of Decedent and

41

the obvious threats presented by Logan and the other assailants to Decedent, knowing that potentially fatal consequences could be suffered by such individuals, including Decedent, as a result of their deliberate indifference. These Defendants, including all decision makers herein, acting on behalf of NCDPS and NCDAC, could and should have taken reasonable steps to ensure that their employees were reasonably and adequately supervised and trained to respond to gang member related issues, the proper safety of Safekeepers, responding to clear signs of a pending hit, and preventing the transporting of contraband weapons.

157. These Defendants, including all decision makers herein, acting on behalf of NCDPS and NCDAC's policies, customs, and practices in failing to adequately supervise and train their employees, were the proximate and legal causes of violations of Decedent's Federal and State Constitutional Rights.

158. After Decedent's death, these Defendants, including all decision makers herein, acting on behalf of NCDPS and NCDAC, further ratified, acquiesced, and condoned the wrongful actions of their COs, supervisors, and other employees by:

    a. Failing to perform a meaningful investigation into the circumstances surrounding Decedent's death;

    b. Failing to take any meaningful action warranted by the findings of the SBI investigation that its COs, supervisors, and other officers and agents had potentially been involved in, participated in, condoned, and assisted the assailants in carrying out the Attack on Mr. Rhodes and by failing to take any meaningful action to correct their policies and procedures, as outlined herein, which clearly had resulted in the Attack and Mr. Rhodes' death;

    c. Ratifying and supporting the wrongful conduct of their COs, supervisors, and other officers and agents;

    d. Ratifying, acquiescing, and condoning the constitutional deprivations committed by its COs, supervisors, and other officers and agents, as alleged herein, with knowledge of the events that had transpired,

e. Failing to take any disciplinary action against the Individually Named Defendants named herein; and

f. In other ways to be established through discovery and at trial.

159.  The Individually Named Defendants were at all times relevant to this claim acting pursuant to the Supervisory Defendants' and NCDPS' and NCDAC's custom, policy, protocol, regulation, wide-spread habit, usage, or practice in their actions pertaining to Decedent. Defendants' actions in this regard are evidenced by a pattern of bad faith and deliberate indifference to safety, health, and well-being needs and constitutional rights of inmates among multiple jail staff as directed towards Decedent.

160.  The acts or omissions of Defendants, jointly and severally, caused Decedent severe mental and physical harm before his death, and proximately caused his death.

161.  As a direct and proximate result of the aforesaid constitutional violations, civil rights violations and misconduct of Defendants, Plaintiff has sustained damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), including for pain and suffering prior to his death, lost earnings, medical expenses, and wrongful death damages.

### FIFTH CLAIM FOR RELIEF
**(North Carolina Constitutional Violations Against NCDPS and NCDAC)**

162.  Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

163.  The Defendants actions, as specifically alleged herein, including but not limited to paragraphs 93 through 122, and 132, 151 (a) through (n), 152-155, 156 (a) through (f) above, are in violation of Article I §§ 1, 19, 20, and 27 of the North Carolina Constitution.

164.  In addition to the direct acts of the Supervisory Defendants and the Correctional Staff Defendants above, who were acting in their official capacity, and were acting within the

43

course and scope of their employment with Defendants NCDPS and NCDAC. Defendants NCDPS and NCDAC have reviewed and ratified the actions of the Supervisory Defendants and the Correctional Staff Defendants and are being sued under North Carolina law, including but not limited to under the doctrine of *respondeat superior.*

165.    As a direct and proximate result of the aforesaid constitutional violations, civil rights violations and misconduct of Defendants the Plaintiff has sustained damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), including for pain and suffering prior to his death, lost earnings, medical expenses, and wrongful death damages.

## SIXTH CLAIM FOR RELIEF
### (N.C.G.S. § 28A-18-2 – Wrongful Death Action Against All Defendants)

166.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

167.    This is an action for damages against Defendants for wrongful death of the Plaintiff's decedent, Ronald Stacey Rhodes.

168.    As a direct and proximate result of Defendants' negligence, gross negligence, willful and wanton conduct, malicious conduct, civil and constitutional violations, and deliberate and reckless indifference for Mr. Rhodes' life, safety, health, and mental health conditions, as alleged in paragraphs 93 through 122, and 132, above, Mr. Rhodes suffered physical pain, mental suffering, and died.

169.    As a result of Decedent's death, Plaintiff is entitled to recover all damages allowed under the North Carolina Wrongful Death Statute including but not limited to: a) expenses for care, treatment and hospitalization incident to the injury resulting in death; b) compensation for physical pain and mental suffering; c) funeral expenses; d) compensation for the loss of services, protection, care and assistance of Mr. Rhodes, whether voluntary or

44

obligatory, to the persons entitled to the damages recovered; e) compensation for the loss of society, companionship, comfort, guidance, kindly offices and advice of Mr. Rhodes to the persons entitled to the damages recovered; and f) punitive damages as warranted by law.

170.    As a direct and proximate result of the aforesaid constitutional violations, civil rights violations and misconduct of the Defendants Plaintiff has sustained damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), including for pain and suffering prior to his death, lost earnings, medical expenses, and wrongful death damages.

## SEVENTH CLAIM FOR RELIEF
### (Punitive Damages Against All Defendants)

171.    Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

172.    Defendants acted in a willful and wanton, malicious, reckless, deliberately indifferent, and egregious manner by, *inter alia*, engaging in the conduct detailed herein, such that Plaintiff is entitled to an award of punitive damages pursuant to North Carolina General Statute § 1D-1, *et. seq*., against Defendants, jointly and severally, in an amount in excess of Twenty-Five Thousand Dollars and No/100 Dollars ($25,000.00).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES REQUIREMENT NOT APPLICABLE

The Prison Litigation Reform Act, 42 U.S.C. § 1997e, requiring exhaustion of administrative remedies prior to suit being filed, only applies to prisoners currently confined or imprisoned. An estate cannot be imprisoned, convicted, or confined. This action was filed by Mr. Rhodes' mother and Estate, neither of whom are confined prisoners. Accordingly, the exhaustion of administrative remedies requirement does not apply to this case. See, Torres Rios v. Pereira Castillo, 545 F. Supp. 2d 204, 206 (D.P.R. 2007).

WHEREFORE, Plaintiff Angela Carter, as Administrator of the Estate of Ronald Stacey Rhodes, prays the Court as follows:

1.     That Plaintiff have and recover from the Defendants, jointly and severally, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) for all damages to which she is entitled, including personal injury, permanent injury, scarring, medical expenses, physical pain, mental suffering, other economic losses, loss of enjoyment of life, and all wrongful death damages;

2.     That Plaintiff recover from Defendants, jointly and severally, punitive damages in an amount to be determined by the trier of fact;

3.     That the Court grant a trial by jury on all issues so triable;

4.     That judgment against Defendants bears interest at the maximum legal rate from the time of the institution of this action or earlier as provided by law;

5.     That the costs of this action, including reasonable attorney's fees as allowed by law, be taxed against Defendants; and

6.     For such other and further relief as the Court may deem just and proper.

This the 6th day of September, 2024.

DEMENT ASKEW JOHNSON &
MARSHALL, LLP

By: _____
James T. Johnson
N.C. State Bar No: 19087
Jonathan W. Martin
N.C. State Bar No: 49381
Post Office Box 711
Raleigh, North Carolina 27602
Telephone:       919-833-5555
Email:      jjohnson@dementaskew.com
              jmartin@dementaskew.com
*Attorneys for Plaintiff*

**CERTIFIED MAIL**

9589 0710 5270 0965 9777 58



PITNEY BOWES
$12.66
US POSTAGE
FIRST-CLASS
026W0002311069
2000368850
ZIP 27601
SEP 11 2024



**DEMENT ASKEW & JOHNSON**
TRUSTED | RELENTLESS | ADVOCATES

333 FAYETTEVILLE STREET, SUITE 1513
P.O. BOX 711 | RALEIGH, NC 27602

**North Carolina Department of Public Safety**
**c/o Ashby T. Ray, Chief Deputy General Counsel**
**Archdale Building, 14th Floor**
**512 N. Salisbury St.**
**Raleigh, NC 27604**

4201

**RECEIVED**

SEP 2 3 2024

DPS
Office of the Secretary

