IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CT-03258-M

| ANGELA CARTER, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | ORDER |
|  | ) |  |
| NORTH CAROLINA DEPARTMENT OF | ) |  |
| ADULT CORRECTION, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

On September 6, 2024, Angela Carter ("plaintiff"), Administrator of The Estate of Ronald Stacey Rhodes ("Rhodes" or "decedent"), filed through counsel a complaint in Wake County Superior Court arising out of Rhodes' death as a pretrial detainee "Safekeeper" at Central Prison on September 9, 2022. See Compl. [D.E. 1-1]. On October 16, 2024, the North Carolina Department of Adult Correction ("DAC") filed a Notice of Removal and removed the action to this court. See [D.E. 1]. On January 6, 2025, all defendants aside from defendant Latisha Harvey moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted, Mot. [D.E. 28], and filed a memorandum in support, see Defs.' Mem. [D.E. 29]. On February 17, 2025, plaintiff filed a response in opposition. Pl.'s Resp. [D.E. 32]. On March 4, 2025, defendants filed at reply. Defs.' Reply [D.E. 33]. On March 14, 2025, defendant Harvey filed a motion to dismiss the complaint that joined the motion of the other defendants, adopting their arguments and authorities. See Mot. [D.E. 35].

As discussed below, the court grants in part and denies in part defendant Harvey's motion and grants in part and denies in part the remaining defendants' motion.

Plaintiff's Complaint:

Plaintiff names as institutional defendants the DAC and the North Carolina Department of Public Safety ("DPS"), (collectively, the "Facility Defendants"). Compl. [D.E. 1-1] at ¶¶3–6.

Plaintiff also names as defendants Warden Denise Jackson; DAC Secretary Todd Ishee; Interim Commissioner of Prisons Brandeshawn Harris; Lieutenant Todd Young; Lieutenant Kyle Hoover; Lieutenant Latisha Harvey; Associate Warden Nakisha Faust; Central Prison Director/Supervisor Tony Taylor; Correctional Program Supervisor Robert Stephenson; Correctional Officer ("C.O.") "in charge of the Gang Unit/Internal Affairs" David Marouchoc; Case Manager Deven McKenna; Correctional Program Supervisor Germel Wilkins; Housing Unit Manager Demetria Horton; Correctional Program Director Richard Wiggins; Correctional Program Director Amy LaFluer; Sergeant Jeremika McClammy; Sergeant Erica Collora; Sergeant Uzoma Iwuala; Sergeant Erin Oates; Sergeant Daniel Brooks; Sergeant Joshua Height; C.O. Richard Brammer; C.O. Chelsey Edwards; C.O. Darnell Windley; Case Manager Christina Ranson; C.O. Emmanuel Ibarra; C.O. Leslyann Pinder; C.O. Michael Copeland; C.O. Natasha Lynch; C.O. Patrick Reaves; C.O. Shane Ray; Phone Investigator Supervisor Dorothy Lee Joyner; C.O. First Name Unknown ("FNU") Ten Broek; C.O. FNU Richardson; C.O. FNU Onoh; C.O. FNU Amerson; C.O. FNU Benmbark; C.O. FNU Mewborn; C.O. FNU Booth; C.O. FNU White; C.O. FNU Reaves; C.O. FNU Custodio; C.O. Jane Doe; and C.O. John Doe (collectively, the "Individually Named Defendants"). Id. at ¶¶6–40, 44.

Plaintiff alleges, *inter alia*, that Jackson, Ishee, Young, Harris, Hoover, Harvey, Faust, and Taylor (collectively, "the Supervisory Defendants"), pursuant to their "supervisory roles at or for Central Prison" during all times alleged were responsible for: "the care, custody, and control of all

2

inmates at Central Prison including all Offenders and Safekeepers"; "the management and control of Central Prison and for the selection, training, assignment, placement, promotion, and discipline of the Central Prison staff"; "the system of complaint and investigation of staff misconduct and for setting standards by which misconduct complaints were reviewed"; and "for issuing, implementing and enforcing the policies and procedures" that "resulted in the deprivation of [Rhodes'] rights under federal law." See id. at ¶41.

Plaintiff further alleges that defendants Stephenson, Marouchoc, McKenna, Wilkins, Horton, Wiggins, LaFluer, McClammy, Collora, Iwuala, Oates, Brooks, Height, Brammer, Edwards, Windley, Ranson, Ibarra, Pinder, Copeland, Lynch, Patrick Reaves, Ray, Joyner, Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, FNU Reaves, Custodio, Jane Doe, and John Doe (collectively, "Correctional Staff Defendants") were employed at Central Prison and assigned correctional roles and duties at the times alleged in the complaint. Id. at ¶42.

Plaintiff alleges that the "Individually Named Defendants" were employees of the "Facility Defendants," which are agencies of the State of North Carolina, such that liability arises under the doctrines of *respondeat superior* and agency. Id. at ¶44.

Plaintiff further asserts that "defendants are being sued in their official capacities for negligence in a separate action before the Industrial Commission pursuant to the Tort Claims Act of North Carolina N.C. Gen. Stat. § 143-291, et. al." Id. at ¶45.

As background, plaintiff alleges, *inter alia*, that: plaintiff is Rhodes' mother; Rhodes was placed on the sex offender registry pursuant to a conviction for kidnapping a 12-year-old when he was 16 years old; Rhodes served a term of incarceration due to a conviction for second-degree kidnapping and other charges circa 2014; circa November 20, 2020, Rhodes "was arrested for

3

additional charges including second-degree rape, stemming from prior incidents"; Rhodes "had been affiliated with a gang" but, at the time of his November 2020 arrest, "upon information and belief, he was not an active gang member"; while in Wake County Jail awaiting disposition of his pending charges, other jail inmates who were gang members "became aware that Mr. Rhodes' pending charges were allegedly sex related"; "Per gang protocol, sex offenders are not allowed in gangs. This is well known among law enforcement and jail and correctional staff members"; "Rhodes received threats from other gang-member inmates"; circa November 2021, Rhodes was physically attacked by other gang-member inmates at the Wake County Jail, "suffered multiple injuries in this attack and required medical treatment, including stitches"; Rhodes and plaintiff requested that Rhodes be moved for safekeeping; on "November 17, 2021, a Safekeeping Order pursuant to N.C. Gen. Stat.§ 162-39 was entered in Wake County Superior Court ordering that Mr. Rhodes be transferred to Central Prison while he continued to await disposition of his pending charges"; this order "stated that this transfer was necessary 'for the defendant's safety in that the defendant presents management issues and concerns which put his safety at risk within the Wake County Detention Center'"; Rhodes was transferred to Central Prison several days later "so that he could be provided proper safety and security from other gang members." See id. at ¶¶50–58.

Plaintiff alleges the relevant portions of N.C. Gen. Stat.§ 162-39 provide that a prisoner may be moved to a unit of state prison system to avoid a security risk in a county jail, and a prisoner poses a security risk if the prisoner . . . "2) Exhibits violently aggressive behavior that cannot be contained and warrants a higher level of supervision; 3) Needs to be protected from other inmates, and the county jail cannot provide such protection;" . . . "or 6) Otherwise poses an imminent danger to the staff of the county jail facility or to other prisoners in the facility." Id. at ¶59.

4

Plaintiff alleges that, although Rhodes was transferred to Central Prison as a Safekeeper because he needed to be protected from other inmates, other inmates were classified as Safekeepers and transferred to Central Prison because of violently aggressive behavior or posing imminent danger to the staff or other prisoners of the county jail. See id at ¶¶60–62. Plaintiff further contends that DAC and DPS policies fail to provide needed separation of these different types of Safekeeper inmates. See id. at ¶¶62–69. Plaintiff also contends that, despite Rhodes' clear need for additional protection, Rhodes was never classified as a Protective Control inmate. Id. at ¶70.

Plaintiff identifies Rhodes' assailants as Alfred Logan, Quashon Williams, Markis Allen, Marquice Grant, and David Mitchell (collectively, "the assailants"), all of whom were validated gang members. Id. at ¶71. Logan, the "leader of the assailants" and attack instigator, was a Safekeeper due to being a security risk to other inmates in the Buncombe County Detention Facility. Id. at ¶¶72–75. Assailant Grant and, by information and belief, the other assailants also were Safekeepers because they were deemed a safety and security threat. Id. at ¶¶76–78.

The attack on Rhodes occurred on September 9, 2022, in the Central Prison "rec yard," an enclosed, locked area surrounded by an approximately 10-foot-high chain-link fence. Id. at ¶79. There were approximately 15 to 25 inmates in the area, all of whom are believed to be Safekeepers, but no effort was made to keep the different types of Safekeepers separate from one another. Id. Defendant Stephenson, the lone officer supervising the rec yard, was stationed outside the fence. Id. at ¶80. Logan and the other assailants approached Rhodes and began a confrontational discussion, but "Defendants did not take any action to investigate, break up the encounter, or stop further escalation." Id. at ¶81. The assailants "began hitting and assaulting Mr. Rhodes." Id. at ¶82. Rhodes ran away directly to defendant Stephenson, but Stephenson, on the other side of

the fence, "was not able or willing to offer meaningful assistance." Id. at ¶83. The assailants caught up with Rhodes, and Logan and another of the assailants "had makeshift knives" and "began stabbing Mr. Rhodes repeatedly." Id. at ¶84. One of the assailants also took a cane from Rhodes and began beating Rhodes with the cane. Id. Logan stabbed deeply into Mr. Rhodes' chest, Rhodes was stabbed by the assailants until he fell to the ground, and the assailants continued to kick, punch, and stab him. Id. at ¶85. As this was occurring, defendant Stephenson "initially did not do anything other than watch the assault occur." Id. at ¶86. "After a few moments," defendant Stephenson "pulled pepper spray out and tried to spray the assailants," hitting one who backed away. Id. "Nevertheless, the assault continued unchecked until Mr. Rhodes lay motionless on the ground." Id. (referring to this incident as "the Attack").

"Minutes went by[,] and eventually other correctional officers enter the rec yard." Id. at 88. Despite Rhodes lying motionless on the ground, the officers "first approached the assailants and placed them in handcuffs." Id. Several officers then approached Rhodes and, although "he was clearly injured, unable to move, unconscious, and unresponsive," these officers "tried to get Mr. Rhodes up and put handcuffs on him." Id. at ¶89. Eventually, a supervising officer "came into the rec yard and told the other COs to put Mr. Rhodes back down on the ground." Id. "They eventually began performing CPR on him," "at some point, medical staff was called in," and Wake County EMS was eventually called." Id. at ¶90. "The Attack occurred at or around 9:30 a.m." Id. "WakeMed Emergency Room records reflect he arrived at the hospital at 10:20 a.m." Id. "The Emergency Room doctor's notes state, 'Patient was found unresponsive without a pulse for approximately 1 hour and 15 minutes.'" Id. Rhodes was pronounced dead and a subsequent autopsy confirmed he had died as a direct result of stab wounds suffered in the Attack. Id. at ¶91.

6

"All Defendants, and specifically including but not limited to Defendants Young, Marouchoc, Collora, Iwuala, Oates, Brooks, Brammer, Hoover, Ray, and Stephenson, negligently failed to render aid to Mr. Rhodes and /or call 911 in a timely fashion." Id. at ¶92.

Plaintiff alleges that witness statements from various inmates indicate that Central Prison staff were "involved, planned, previously knew about, assisted, was responsible for, and/or ordered the Attack on Mr. Rhodes." Id. at ¶93. Plaintiff specifically alleges Witness inmate Dayshawn Beckham "said that 'the "police" [meaning staff] got to the victim and put a "hit" out on the victim,'" and that days before the Attack, Beckham "overheard a female correctional officer tell one of the assailants 'get him' after sharing Mr. Rhodes charging information with inmates." See id. at ¶¶93, 99. "Witness inmate Edward Wright also stated that Rhodes' charges were shared by a correctional officer earlier in the week." Id. at ¶93. Plaintiff further alleges that assailant and witness David Mitchell stated in his post-attack interview, that: "the correctional officers were helping them"; "the correctional officers are on the payroll for the gang[,] and they help them out be weeding out who the sex offenders are and who the snitches are and then sharing that information with the gang members"; and that "every correctional officer on that day shift basically does it." Id. (internal quotation marks omitted); see id. at ¶100.

Plaintiff asserts all the Supervisory Defendants and Correctional Staff Defendants "were employed at Central Prison and on duty on the day of the Attack or during the week of the Attack [sic]," id. at ¶94, and were aware: "that the assailants had been transferred to Central Prison as Safekeepers because they were gang members, and they were deemed a safety and security threat to jail staff and other inmates"; "that Mr. Rhodes had been transferred to Central Prison as a Safekeeper because he was a target and needed extra

7

protection from violence at the hands of other inmates, specifically including gang members"; "that Mr. Rhodes and all the assailants were gang members"; "of Mr. Rhodes' status as a sex offender"; and "that sex offenders were not allowed in gangs and that therefore Mr. Rhodes was a clear target for violence at the hands of other gang member inmates, specifically including the assailants," id. at ¶¶95–97.

Plaintiff alleges that, "upon information and belief, Mr. Rhodes was housed in Unit 2E, which only housed Safekeepers," but the different Safekeeper types were not separated. Id. at ¶98. Plaintiff also alleges that, prior to the Attack, "Logan met with other gang-member inmates to discuss the hit on Rhodes," other gang members had meetings to discuss "the hit," and these meetings were "in the open for all correctional officers to see." Id. at ¶101. Plaintiff contends that defendants, especially defendant Marouchoc, train "to detect and stop gang-related activity," that such meetings were "clear notice that a gang-related hit was imminent," but that defendants "did nothing to investigate or stop the planned Attack." Id.

In the days leading up to the Attack, Rhodes informed his fiancée and family to pray for his safety, which plaintiff alleges indicated "a hit on Rhodes was imminent," and "expressed concern specifically about 'Fox,' which is the gang nickname for assailant Logan," about which all defendants knew, and which indicated that Logan would be involved in the imminent "hit" on Rhodes, but defendants, specifically Joyner and Taylor who monitor inmate communications, "did nothing to investigate or try to prevent the Attack." Id. at ¶¶103–05.

Plaintiff further alleges that, in his post-attack interview, Logan "insinuated . . . that the correctional officers knew if they put him together with Rhodes, he was going to kill Rhodes." Id. at ¶¶105–06.

8

Plaintiff alleges that all defendants: knew Rhodes was a sex offender; knew Logan was charged with multiple murders and "had been putting hits on other inmates at the local jail"; "knew that Rhodes and Logan, and the other assailants were gang members"; and "knew that sex offenders were not allowed in gangs and that therefore Rhodes was a target." Id. at ¶107.

Plaintiff alleges that the "Facility Defendants" and the "Supervisory Defendants," in both their individual and official capacities, were "negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safely of Mr. Rhodes and others [sic]" by failing to classify Rhodes as a Protective Control inmate, or enact and adhere to "appropriate policies and procedures" to ensure that Safekeepers transferred to Central Prison due to their "need of special protection from attacks at the hands of fellow inmates" were separated from "the Safekeepers who were transferred to Central Prison because there were violent, dangerous, and an imminent threat to the safety of staff and other inmates." See id. at ¶¶108–11.

Plaintiff alleges that all defendants "were negligent, grossly negligent, malicious, willful, wanton, and exhibited deliberate indifference to the rights and safety of Mr. Rhodes and others [sic]" when they: failed "to act on, and/or respond to, clear and obvious signs and indications that an assault against Mr. Rhodes was imminent and going to occur," including gang activity and Rhodes' communications with outside persons; failed "to take any action in response to the information being relayed among inmates and between inmates and COs that Logan and the other assailants were aware that Mr. Rhodes' charges were sex related, and knowing that gangs did not allow sex offenders in their ranks, and knowing that Logan and the other assailants had commenced a target on Mr. Rhodes for a violent and deadly assault"; "by intentionally providing information to inmates, including the assailants, regarding Mr. Rhodes' pending sex-related charges and prior

9

sex-related convictions, knowing that Mr. Rhodes would immediately thereafter be the target of an attack"; "by creating an atmosphere and environment whereby COs regularly provided gang-member inmates charging information on sex offender inmates for the purpose of inflicting punishment on the sex offender inmates and/or for the purpose of weeding out the sex offender inmates"; "by intentionally moving the assailants into a unit allowing them to be in the rec yard together with Mr. Rhodes, knowing that the assailants were going to attack Mr. Rhodes and knowing that they did not have proper procedures and protections in place to prevent violent attacks"; "by failing to provide any oversight or security in the rec yard on the day of the Attack, except for one CO stationed on the outside of the fence, despite knowledge that an attack was imminent and going to occur"; "by creating an atmosphere and environment whereby inmates were allowed to possess and carry from unit to unit dangerous and lethal weapons"; "by allowing Logan and the other assailants to possess and carry from unit to unit dangerous and lethal weapons on the day of the Attack"; "by creating an atmosphere and environment whereby gang-member inmates were allowed to control and manage the movement and placement of other inmates"; "by specifically allowing Logan and the other assailants, who were all gang-members, to control and manage the movement and placement of other inmates"; and "by failing to provide timely aid and/or call for medical attention to Mr. Rhodes after the Attack, despite knowledge that an attack was imminent and going to occur, specifically including but not limited to Defendants Young, Marouchoc, Collora, lwuala, Oates, Brooks, Brammer, Hoover, Ray, and Stephenson." Id. at ¶¶112–22.

As a first claim for relief, plaintiff asserts negligence against all Individually Named Defendants. Id. at ¶¶129–133.

10

As a second claim for relief, plaintiff asserts gross negligence and malicious conduct against all Individually Named Defendants. Id. at ¶¶134–41.

As a third claim for relief, premised on 42 U.S.C. § 1983, plaintiff asserts violations of Rhodes' Fourth, Eighth, and Fourteenth Amendment rights against all Individually Named Defendants in their official and individual capacities. Id. at ¶¶142–49.

As a fourth claim for relief, under § 1983, plaintiff asserts "defendants' supervisory violations of [Rhodes'] Fourth, Eighth, and Fourteenth Amendment" rights against the Supervisory Defendants and Correctional Staff Defendants under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978) ("Monell"). Id. at ¶¶150–61.

As a fifth claim for relief, plaintiff asserts North Carolina Constitutional Violations Against DPS and DAC. Id. at ¶¶162–65.

As a sixth claim for relief, under N.C. Gen. Stat. § 28A-18-2, plaintiff alleges a wrongful death claim against all defendants. Id. at ¶¶166–70.

As a seventh claim for relief, plaintiff seeks punitive damages against all defendants. Id. at ¶¶171–72.

For relief, plaintiff seeks compensatory damages, punitive damages, court costs and attorney fees, interest, a jury trial, and any further just and proper relief. See id. at 47.

Legal Standard:

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests subject-matter jurisdiction–a court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted). "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Id. at 104; see also Evans v. B.F. Perkins

Co., 166 F.3d 642, 647 (4th Cir. 1999) ("The plaintiff has the burden of proving that subject matter jurisdiction exists.").

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted). The court need neither accept a complaint's legal conclusions drawn from the facts, see id. at 679, nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments," Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quotation omitted). The court, however, accepts as true the complaint's well-pleaded factual allegations and construes these allegations, and the reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

Discussion:

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Further, a plaintiff also "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676; Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). The doctrine of *respondeat superior* generally does not apply to a § 1983

12

action. See Iqbal, 556 U.S. at 677; Monell, 436 U.S. at 691–92. Rather, for a supervisory liability claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

Although plaintiff raises § 1983 claims against all the Individually Named Defendants in their official capacities, as defendants argue, see Defs.' Mem. [D.E. 29] at 6–7, and as plaintiff subsequently acknowledged, see Pl.'s Resp. [D.E. 32] at 8, such claims are barred by sovereign immunity under the Eleventh Amendment because North Carolina has not waived immunity, see Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989).

Next, the court does not discern any viable claims under the Fourth or Eighth Amendments. Rather, as Rhodes was a pretrial detainee, the § 1983 claims are evaluated under the Fourteenth Amendment's Due Process Clause. See Kingsley v. Hendrickson, 576 U.S. 389, 400–01 (2015); Bell v. Wolfish, 441 U.S. 520, 535 (1979) (holding, "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee."); Short v. Hartman, 87 F.4th 593, 604–05 (4th Cir. 2023) ("Short") ("pretrial detainees can state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm"), cert. denied, 144 S. Ct. 2631 (2024).

As to the Correctional Staff Defendants, because the pleading presents sufficient facts to raise a reasonable expectation that discovery will reveal evidence needed to establish the precise

13

role of each defendant's involvement in the events alleged, see Twombly, 550 U.S. at 556, plaintiff's § 1983 failure-to-protect claims against Stephenson, see Compl. [D.E. 1-1] at ¶86, Marouchoc, see id. at ¶101, Joyner and Taylor, see id. at ¶¶103–05, and the Jane and John Doe Correctional Officers, see id. at ¶¶40, 93, 99, and the deliberate indifference claims against Young, Marouchoc, Collora, Iwuala, Oates, Brooks, Brammer, Hoover, Ray, and Stephenson, see id. at ¶92, survive defendants' motions to dismiss, see Short, 87 F.4th at 611 (requiring a showing that defendants acted or failed to act "in the face of an unjustifiably high risk of harm is either known or so obvious that it should be known"); see also Hammock v. Andoh, No. 22-7159, 2024 WL 33694, at *1 (4th Cir. Jan. 3, 2024) (per curiam) (unpublished) (noting Short "held that a pretrial detainee's failure-to-protect claim must be evaluated under an entirely objective standard.").

Plaintiff, however, fails to sufficiently allege the necessary personal involvement of the other Correctional Staff Defendants: McKenna, Wilkins, Horton, Wiggins, LaFluer, McClammy, Height, Edwards, Windley, Ranson, Ibarra, Pinder, Copeland, Lynch, Patrick Reaves, Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, FNU Reaves, and Custodio. See Iqbal, 556 U.S. at 676; Wright, 766 F.2d at 850. Plaintiff's claims against these defendants instead amount to mere "labels and conclusions." Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level"). These defendants are dismissed without prejudice, permitting plaintiff to amend the complaint by the close of discovery if their personal involvement becomes apparent.

Next, plaintiff alleges that the Supervisory Defendants 1) had at least constructive knowledge of widespread conduct – whether at the policy level regarding the comingling of

14

Safekeepers in need of protection with Safekeepers who were dangerous to others, or at the day-to-day supervision of the Central Prison environment where COs regularly assisted gang-members with identifying sex offender inmates for "weeding out," see Compl. [D.E. 1-1] at ¶¶93–122 – which 2) "posed a pervasive and unreasonable risk of harm of constitutional injury," and 3) there was an "affirmative causal link" between their "inaction and the particular constitutional injury suffered" by Rhodes, Shaw, 13 F.3d at 799. Thus, the supervisory liability claims against the Supervisory Defendants survive the motions to dismiss.

The court now considers defendants' arguments for qualified immunity. Government officials are entitled to qualified immunity when 1) plaintiff has not demonstrated a violation of a constitutional right, or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Because, as discussed above, plaintiff plausibly alleges that the surviving Individually Named Defendants violated Rhodes' clearly established Fourteenth Amendment rights, see Short, 87 F.4th at 611; Shaw, 13 F.3d at 799, defendants' qualified immunity argument presently fails, but they may reassert this argument on a more developed record.

The court now turns to plaintiff's state-law claims. First, because the court dismisses all federal claims against defendants McKenna, Wilkins, Horton, Wiggins, LaFluer, McClammy, Height, Edwards, Windley, Ranson, Ibarra, Pinder, Copeland, Lynch, Patrick Reaves, Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, FNU Reaves, and Custodio, the court declines to exercise supplemental jurisdiction over plaintiff's various state-law claims against these defendants. 28 U.S.C. § 1367(c)(3); see United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001).

15

Next, North Carolina's Tort Claims Act (the "Act") provides a limited waiver of sovereign immunity for negligence claims asserted against state departments, institutions, and agencies, as well as individual employees sued in their official capacity. See N.C. Gen. Stat. § 143-291(a). The Act, however, waives this immunity only for claims filed in the North Carolina Industrial Commission ("NCIC"). To wit:

> This Article provides the sole and exclusive remedy for any claim that arises as a result of the negligence of any officer, employee, involuntary servant, or agent of the state while acting within the scope of his office, employment, service, agency, or authority, and the North Carolina Industrial Commission is the sole and exclusive forum for hearing any such claims. Any such claims filed in any other forum arising out of or relating to the same subject matter against the officer, employee, involuntary servant, or agent of the State is precluded.

N.C. Gen. Stat. § 143-291(e).

Thus, the court lacks jurisdiction to consider official capacity negligence claims against the Individually Named Defendants. See Kentucky v. Graham, 473 U.S. 159, 165 (1985); Stewart v. North Carolina, 393 F.3d 484, 490 (4th Cir. 2005) (holding, as to claims sounding in negligence against the state and its agencies, North Carolina has vested exclusive jurisdiction in the NCIC).

Although defendants argue the October 2023 enactment of § 143-291(e) also precludes negligence claims against defendants in their individual capacity aside from suits in the NCIC, the court declines to find so on the instant motions to dismiss. See Carias v. N. Carolina Dep't of Pub. Safety, No. 1:24-CV-765 (RDA/JLW), 2025 WL 2404530, at *8–9 (M.D.N.C. Aug. 19, 2025) (collecting cases and denying defendants' motion to dismiss on this ground).

Plaintiff's state-law claims against the surviving Individually Named Defendants in their individual capacities are sufficiently alleged to survive the motions to dismiss. But see Gonzalez v. Bennett, No. 5:24-CT-3139-FL, 2025 WL 818556, at *11–13 (E.D.N.C. Mar. 13, 2025) (citing,

16

*inter alia*, Knibbs v. Momphard, 30 F.4th 200, 226 (4th Cir. 2022), and discussing the interplay between common law tort claims and North Carolina's survivorship and wrongful death statutes).

Next, defendants also assert that they are entitled to public officers' immunity.

> Under this doctrine, public officers or officials may not be held liable for negligence "in the performance of their governmental or discretionary duties." Meyer v. Walls, 347 N.C. 97, 112 (1997). Thus, a public officer may be liable in his individual capacity only when he is 1) malicious, 2) corrupt, or 3) acting outside of or beyond the scope of his duties. Id. A public officer "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial and injurious to another." Grad v. Kaasa, 312 N.C. 310, 313 (1984). An act is "wanton" where "it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. However, there is a general presumption "that a public official in the performance of his official duties acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551(1981) (internal citation omitted).

Morgan v. Spivey, No. 5:16-CV-365-FL, 2017 WL 4399539, at *9 (E.D.N.C. Sept. 29, 2017).

Because, as discussed above, the surviving Individually Named Defendants presently are not entitled to qualified immunity, they likewise are not now entitled to public officers' immunity. See Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) ("An officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right." (quoting Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003)); Bailey, 349 F.3d at 742 (noting North Carolina public officers' immunity is "unavailable to officers who violate clearly established rights").

The court now turns to defendants' arguments regarding plaintiff's claim premised on the North Carolina Constitution. In response to defendants' argument, plaintiff acknowledges that state constitutional claims are not allowed against individuals and consents to dismissal of such claims against the Individually Named Defendants in their individual capacity. See Pl.'s Resp.

17

[D.E. 32] at 26 n.6. Accordingly, the court dismisses the state constitutional claims as to the Individually Named Defendants in their individual capacity, but presently declines to dismiss altogether the state constitutional claims. Compare Zayre-Brown v. N. Carolina Dep't of Pub. Safety, No. 3:22-CV-191-MOC-DCK, 2024 WL 410243, at *6 (W.D.N.C. Feb. 2, 2024), with Gonzalez, 2025 WL 818556, at *9–11.

## Conclusion:

In sum, the court: GRANTS IN PART and DENIES IN PART Harvey's motion to dismiss as discussed above [D.E. 35]; GRANTS IN PART and DENIES IN PART the remaining defendants' motion to dismiss as discussed above [D.E. 28]; DISMISSES WITHOUT PREJUDICE McKenna, Wilkins, Horton, Wiggins, LaFluer, McClammy, Height, Edwards, Windley, Ranson, Ibarra, Pinder, Copeland, Lynch, Patrick Reaves, Ten Broek, Richardson, Onoh, Amerson, Benmbark, Mewborn, Booth, White, FNU Reaves, and Custodio as defendants; and DIRECTS the clerk to continue management of the case.

SO ORDERED this 29th day of September, 2025.

Richard E. Myers II
RICHARD E. MYERS II
Chief United States District Judge